ATTORNEY FOR APPELLANT
Lisa M. Johnson
Ann Sutton
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sánchez
Michael Gene Worden
Deputy Attorneys General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

**FILED**
Jun 22 2011, 10:47 am

*CLERK*
of the supreme court,
court of appeals and
tax court

No. 49S02-1101-JV-11

D.M.,

*Appellant (Respondent below),*

v.

STATE OF INDIANA,

*Appellee (Petitioner below).*

Appeal from the Marion Superior Court, Juvenile Division, No. 49D09-1001-JD-000125
The Honorable Marilyn A. Moores, Judge
The Honorable Scott B. Stowers, Magistrate

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1005-JV-551

**June 22, 2011**

**Sullivan, Justice.**

A juvenile challenges the admissibility of his confession in a delinquency proceeding on grounds that he was not afforded an opportunity for meaningful consultation with his mother and that the waiver of his rights was not knowing and voluntary. We conclude that there was substantial evidence of probative value to support the juvenile court's decision to admit the confes-

sion. We also conclude that the juvenile waiver form used by the police in this case should be clarified.

## Background

On Wednesday, January 13, 2010, thirteen-year-old D.M. and his friend, C.W., entered firefighter Brian Braunagel's residence without permission while no one was home and took several items of Braunagel's personal property. They entered the house by using the garage-door code they had obtained from Braunagel's sons, with whom they had had a recent disagreement.

Braunagel was notified of the apparent break-in while he was at work. He left work immediately and called the police at approximately 1:50 p.m., while en route to his house. When the police arrived, they were given information that implicated D.M. and C.W. in the break-in. Two uniformed officers went to C.W.'s house sometime after 2:00 p.m., arrested D.M. and C.W., and brought them to the Braunagel residence.

Shortly after 3:00 p.m., a uniformed officer went to D.M.'s residence and informed D.M.'s mother ("Mother") that her son had been arrested. She went down the street to the Braunagel residence where D.M. was being held in a police cruiser. According to Mother, D.M. attempted on several occasions to speak with her through the window of the police car, but the police officers on scene told her that she could not speak to him until the detective arrived because they did not want the investigation impaired. Mother also testified that she was told by the officers that she would not be permitted to speak to D.M. until she signed a waiver form. Furthermore, Mother alleged that there were several firefighters on the scene who were glaring at her and making hostile comments.

Around 4:00 p.m., Indianapolis Metropolitan Police Detective Mark Quigley arrived at the Braunagel residence and was introduced to D.M. and Mother. He spoke briefly with Mother, who advised him that D.M. would make a statement. Quigley then took D.M. and Mother to his car and advised them of D.M.'s rights. He read the rights to them from the "Juvenile Waiver" form and then had D.M. and Mother read the form. After D.M. and Mother signed the top part

2

of the form acknowledging that they had been advised of and understood D.M.'s rights, Quigley told them that he was going to give them some time to talk alone and that they could have "as much time as they wanted." Tr. 42. He returned several minutes later and asked if they were done talking; "[Mother] said yes." Id. at 43. Quigley then had them read the waiver-of-rights section at the bottom of the waiver form, and they both signed it. D.M. then confessed in detail and told Quigley where he had hidden one of the stolen items.

On January 14, 2010, the State filed a petition in Marion Superior Court, Juvenile Division, alleging D.M. to be a delinquent child for committing acts that would constitute Class B felony burglary[1] and Class D felony theft[2] if committed by an adult. At the factfinding hearing on April 1, 2010, D.M.'s confession was admitted over objection, and the juvenile court found that the allegations in the petition were true. At a dispositional hearing on April 29, 2010, the juvenile court placed D.M. on probation until October 28, 2010, with special conditions.

The Court of Appeals affirmed in a 2-1 unpublished memorandum decision. D.M. v. State, No. 49A02-1005-JV-551, 2010 Ind. App. Unpub. LEXIS 1575, 2010 WL 4546660 (Ind. Ct. App. Nov. 12, 2010). Over the dissent of Judge Mathias, the majority held that D.M. had been given an opportunity for meaningful consultation with Mother and that D.M.'s waiver was voluntary under the totality of the circumstances.

D.M. sought, and we granted, transfer, D.M. v. State, ___ N.E.2d ___ (Ind. 2011) (table), thereby vacating the opinion of the Court of Appeals, Ind. Appellate Rule 58(A).

Additional facts will be provided where necessary.

---

[1] Ind. Code § 35-43-2-1 (2008).
[2] I.C. § 35-43-4-2.

3

**Discussion**

The Fifth Amendment,[3] the Due Process Clause of the Fourteenth Amendment,[4] and Article I, Section 14 of the Indiana Constitution[5] protect the privilege against self-incrimination and ensure that only a person's voluntary statements can be used against that person in a criminal prosecution. E.g., Dickerson v. United States, 530 U.S. 428, 432-34 (2000); Ajabu v. State, 693 N.E.2d 921, 927-34 (Ind. 1998). The privilege applies not only in court proceedings but also when law enforcement interrogates a suspect who is in custody − i.e., custodial interrogation. See, e.g., Bram v. United States, 168 U.S. 532, 542 (1897); Ogle v. State, 193 Ind. 187, 191-93, 127 N.E. 547, 548-49 (1920). The privilege also prohibits the use of compelled statements in juvenile delinquency proceedings.[6] In re Gault, 387 U.S. 1, 42-55 (1967); see, e.g., J.D.B. v. North Carolina, 564 U.S. ___ (2011); J.D.P. v. State, 857 N.E.2d 1000 (Ind. Ct. App. 2006); see also I.C. § 31-32-2-2.

In 1972, this Court responded to the U.S. Supreme Court's admonition that "special caution" be used in the context of juvenile confessions, In re Gault, 387 U.S. at 45; see also Fare v. Michael C., 442 U.S. 707, 728-30 (1979) (Marshall, J., dissenting), by holding that Indiana law requires the use of procedural safeguards in addition to those required by Miranda v. Arizona, 384 U.S. 436, 445-67, 478-79 (1966), when a juvenile is subjected to custodial interrogation. Lewis v. State, 259 Ind. 431, 439-40, 288 N.E.2d 138, 142 (1972). In an opinion written by Justice DeBruler, we held that, as a precondition to using a juvenile's statements from a custodial interrogation against him or her in court, both the juvenile and his or her parent or guardian must be advised of the juvenile's Miranda rights and they must be afforded an opportunity for meaningful consultation with each other to discuss privately whether the juvenile should waive or invoke his or her rights. Id. We reasoned that "[h]aving a familiar and friendly influence present

---

[3] U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."); Malloy v. Hogan, 378 U.S. 1, 6 (1964) (applying Self-Incrimination Clause to States).

[4] U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . .").

[5] Ind. Const. art. I, § 14 ("No person, in any criminal prosecution, shall be compelled to testify against himself.").

[6] Juvenile delinquency proceedings are civil proceedings, not criminal proceedings, and are based on a philosophy of social welfare rather than criminal punishment. Kent v. United States, 383 U.S. 541, 554-55 (1966); Bible v. State, 253 Ind. 373, 378-80, 254 N.E.2d 319, 321-22 (1970).

4

at the time the juvenile is required to waive or assert his [or her] fundamental rights assures at least some equalization of the pressures borne by a juvenile and an adult in the same situation." Id. at 440, 288 N.E.2d at 142.

The General Assembly subsequently codified our holding in Lewis.[7]  Pub. L. No. 136-1978, § 1, 1978 Ind. Acts 1196, 1232 (codified as amended at I.C. § 31-32-5-1).  The current statute provides, in relevant part, that any of a juvenile's rights under the federal or state constitutions, or under any other law, may be waived only:

> (2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
>     (A) that person knowingly and voluntarily waives the right;
>     (B) that person has no interest adverse to the child;
>     (C) meaningful consultation has occurred between that person and the child; and
>     (D) the child knowingly and voluntarily joins with the waiver

I.C. § 31-32-5-1(2).

In Indiana, there are thus four requirements that must be satisfied before a juvenile's statements made during a custodial interrogation[8] can be used in the State's case-in-chief.  First, both the juvenile and his or her parent[9] must be adequately advised of the juvenile's rights.  Miranda, 384 U.S. at 444-45, 467-74, 478-79; Lewis, 259 Ind. at 439, 288 N.E.2d at 142.  Second, the juvenile must be given an opportunity for meaningful consultation with his or her parent. I.C. § 31-32-5-1(2); Lewis, 259 Ind. at 439, 288 N.E.2d at 142.  Third, both the juvenile and his or her parent must knowingly, intelligently, and voluntarily waive the juvenile's rights.  I.C. § 31-32-5-1(2); Miranda, 384 U.S. at 475-76.  Finally, the juvenile's statements must be voluntary and not the result of coercive police activity.  Colorado v. Connelly, 479 U.S. 157, 167 (1986).

---

[7] In fact, the statute goes beyond Lewis to require that a qualifying adult join in the juvenile's waiver. E.g., Whipple v. State, 523 N.E.2d 1363, 1370 n.2 (Ind. 1988).

[8] There is no dispute that D.M. was subjected to custodial interrogation because he was under arrest and was questioned by Quigley.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (interrogation); Luna v. State, 788 N.E.2d 832, 833-34 (Ind. 2003) (custody); cf. J.D.B. v. North Carolina, 564 U.S. at ___ (slip op. at 8-14) (holding that a child's age is a relevant objective factor to consider in determining whether the child is "in custody" for Miranda purposes).

[9] For purposes of this opinion, we use the shorthand "parent" as inclusive of all the qualifying adults identified in Indiana Code section 31-32-5-1(2).

5

# I

D.M. challenges the juvenile court's denial of his motion to suppress on two fronts.[10] First, he contends that he was deprived of an opportunity for meaningful consultation with Mother. Second, he contends that the waiver of his rights was not knowing, intelligent, and voluntary.

The State bears the burden of proving beyond a reasonable doubt that the juvenile received all of the protections of Indiana Code section 31-32-5-1, Brown v. State, 751 N.E.2d 664, 670 (Ind. 2001), and that both the juvenile and his or her parent knowingly, intelligently, and voluntarily waived the juvenile's rights,[11] Stewart v. State, 754 N.E.2d 492, 494-95 (Ind. 2001). Cf. Douglas v. State, 481 N.E.2d 107, 111-12 (Ind. 1985) (procedural safeguards judged by same standard as voluntariness). In reviewing a court's denial of a motion to suppress a confession, we do not reweigh the evidence but instead examine the record to determine whether there is substantial evidence of probative value to support that decision. Willsey v. State, 698 N.E.2d 784, 789 (Ind. 1998). We consider any conflicting evidence in a light most favorable to the ju-

---

[10] There appears to have been some confusion as to whether D.M. challenged the voluntariness of his confession. D.M.'s brief to the Court of Appeals and his Petition to Transfer are devoid of any argument that his statements were involuntary under the Due Process Clause, but some of the cases that he cites address the voluntariness of a confession rather than the voluntariness of a waiver, and both the State and the Court of Appeals purported to address both. The issues of voluntariness of a waiver and voluntariness of a confession are similar in that they both require evaluation of the totality of the circumstances, Carter v. State, 686 N.E.2d 1254, 1257 (Ind. 1997), and often times the arguments made as to one issue may be applicable to the other, Magley v. State, 263 Ind. 618, 627, 335 N.E.2d 811, 817 (1975), overruled on other grounds, Smith v. State, 689 N.E.2d 1238, 1246 n.11 (Ind. 1997). Cf. Missouri v. Seibert, 542 U.S. 600, 608-09 (2004) (plurality opinion) ("[G]iving the [Miranda] warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after [Miranda] warnings and voluntary waiver of rights requires unusual stamina . . . ."); Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."). But we reiterate that they are separate issues and should be presented, argued, and analyzed as such. See, e.g., Crain v. State, 736 N.E.2d 1223, 1230-32 (Ind. 2000) (conducting separate analyses); Carter, 686 N.E.2d at 1257-60 (same); cf. Dickerson, 530 U.S. at 444 ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.").

[11] The State's burden of proving voluntariness is greater under Indiana law than it is under the federal constitution, which requires only that the prosecution prove by a preponderance of the evidence that both the waiver and the statement were voluntary. See Connelly, 479 U.S. at 168; Lego v. Twomey, 404 U.S. 477, 489 (1972); Wilkes v. State, 917 N.E.2d 675, 680 (Ind. 2009).

venile court's decision, Brown, 751 N.E.2d at 670, along with any substantial uncontested evidence, Douglas, 481 N.E.2d at 111-12. And we will uphold the decision if it is supported by "a reasonable view of the evidence." Willsey, 698 N.E.2d at 789.

## A

D.M. contends that the juvenile court erred in admitting his confession because the State failed to carry its burden in proving that he received the protections of the juvenile waiver statute. Indiana Code section 31-32-5-1 requires that, before a juvenile's rights are waived, he or she must be afforded an opportunity for meaningful consultation with a parent. The mere presence of a parent, standing alone, does not satisfy the statute. Hall v. State, 264 Ind. 448, 451, 346 N.E.2d 584, 587 (1976). Rather, the consultation requirement is satisfied "when the State demonstrates 'actual consultation of a meaningful nature or . . . the express opportunity for such consultation, which is then forsaken in the presence of the proper authority by the juvenile, so long as the juvenile knowingly and voluntarily waives his [or her] constitutional rights.'" Brown, 751 N.E.2d at 670 (ellipsis in original) (quoting Williams v. State, 433 N.E.2d 769, 772 (Ind. 1982)). Additionally, the opportunity for the juvenile and the parent to counsel with each other must occur before the juvenile's rights are waived because the purpose of consultation is to allow the juvenile to make a decision on whether to waive his or her rights in a comparatively relaxed and stable atmosphere. Patton v. State, 588 N.E.2d 494, 496 (Ind. 1992); cf. Lewis, 259 Ind. at 439-40, 288 N.E.2d at 142.

To prove that "actual consultation of a meaningful nature" occurred, the State needs only to prove that the police provided a relatively private atmosphere that was free from police pressure in which the juvenile and the parent could have had a meaningful discussion about the "allegations, the circumstances of the case, and the ramifications of their responses to police questioning and confessions." Trowbridge v. State, 717 N.E.2d 138, 148 (Ind. 1999); see also Hall, 264 Ind. at 452, 346 N.E.2d at 587 (providing that "meaningful consultation can only occur in the absence of the neutralizing pressures which result from police presence"). The interrogating officer cannot dictate or even recommend how they should use this time. Trowbridge, 717 N.E.2d at 148; Patton, 588 N.E.2d at 495 n.3; Whipple v. State, 523 N.E.2d 1363, 1371 (Ind.

7

1988); <u>Buchanan v. State</u>, 268 Ind. 503, 506-07, 376 N.E.2d 1131, 1134 (1978). "What is important is that the child and adult be aware of and understand the child's rights in order to discuss them intelligently." <u>Patton</u>, 588 N.E.2d at 496. Once such an opportunity is provided, it is up to the juvenile and the parent to use this opportunity to their advantage. <u>Id.</u> at 495 n.3; <u>Whipple</u>, 523 N.E.2d at 1371. The State need not show that the consultation was beneficial in helping the juvenile and his or her parent decide whether to waive or stand on the juvenile's rights. <u>Fortson v. State</u>, 270 Ind. 289, 298-99, 385 N.E.2d 429, 436 (1979); cf. <u>Trowbridge</u>, 717 N.E.2d at 148; <u>Fowler v. State</u>, 483 N.E.2d 739, 743 (Ind. 1985); <u>Buchanan</u>, 268 Ind. at 506-07, 376 N.E.2d at 1134. Rather, the extent to which the conversation aids in the waiver decision "is a circumstance among many others which the trial court may consider in arriving at its decision as to whether the waiver is voluntary and knowing." <u>Fortson</u>, 270 Ind. at 299, 385 N.E.2d at 436.

D.M.'s primary argument is that the "uncontested evidence" establishes that Mother was told that she could not talk to her son until she signed a waiver, and, therefore, the decision to waive his rights was made prior to the opportunity for consultation. We cannot characterize Mother's testimony as "uncontested." Although the State did not directly contradict Mother's testimony, it did attempt to impeach her credibility. For example, it challenged her memory by showing that she could not remember how many times she had signed the juvenile waiver form. She testified that she had signed the form once, and when presented with the form, which bore her signature twice, she testified that she did not remember signing it more than once. She was also reluctant to admit that she had no personal knowledge of how long D.M. had been detained before she was permitted to speak with him, refusing to provide a direct answer to the State's rather straightforward question until being prompted by the court to "[a]nswer the question please." Tr. 34-36. Furthermore, at several points in her testimony she stated that D.M. had been in custody for over three hours before Quigley arrived, but the record indicates that he was in custody for two hours, at the most.[12] Having listened to Mother's live testimony and observed her demeanor, the juvenile court reasonably could have found that she was not a credible witness. Cf. <u>Willsey</u>, 698 N.E.2d at 790 n.4.

---

[12] Moreover, under direct examination she claimed that the police had been questioning D.M. before Quigley arrived, but, aside from this testimony, there is absolutely nothing in the record to suggest that this was true, and Mother could have had no personal knowledge because she admitted she had not been present. The juvenile court, therefore, reasonably could have found this direct testimony doubtful.

8

Even accepting Mother's testimony as true, other facts in the record demonstrate that the actual procedure utilized was sufficient to remedy any prior ambiguity and that D.M.'s rights were not waived until after an opportunity for meaningful consultation had been provided. Quigley advised both D.M. and Mother of D.M.'s rights, after which they acknowledged an understanding of those rights and signed the advisement section of the waiver form. At this point, D.M. had not waived any rights or been interrogated. Quigley then told D.M. and Mother that they could have as much time to talk as they needed. He showed them that he was turning off his tape recorder and told them he would take it with him while they talked. He then left them sitting in his car, alone, and walked about 20 feet away from the car to talk to some of the uniformed officers. At this distance he could not overhear their conversation, and there is no evidence that any other police officer was near the car or could overhear their conversation. Quigley returned to the car after several minutes and asked them if they were done talking, and Mother said that they were. He then read the waiver section of the form to them and allowed them to read it. It is unclear whether Mother actually read the form, but both she and D.M. signed the waiver. After the waiver was signed, Quigley <u>began</u> the interrogation by asking D.M. to tell him what had happened that day. Thus, D.M.'s rights were not waived until after he and Mother had had an opportunity for meaningful consultation free from police pressure. Moreover, this was not a case where "the precise forces [the consultation requirement] was designed to protect against had already been fully applied by overzealous police activities." <u>Hall</u>, 264 Ind. at 453, 346 N.E.2d at 587.

D.M. also argues that the atmosphere was too intimidating for a "meaningful consultation" because he and Mother were in the backseat of a police car, there were many uniformed officers and firefighters on scene, Mother was concerned that their conversation was being recorded (despite Quigley's statement to the contrary), and some of the firefighters were glaring at and making hostile comments to Mother prior to Quigley's arrival. The atmosphere here is analogous to the atmosphere in <u>Fowler v. State</u>, 483 N.E.2d 739, 743 (Ind. 1985). In that case, we concluded that the juvenile and his mother had had sufficient privacy to discuss the waiver decision even though they talked in a laboratory reception area at the police station where people were "coming and going" while the interrogating officer stood on the opposite side of a sliding-

9

glass window. Id. To be sure, the consultation in Fowler occurred at the stationhouse instead of a police car, but this is a distinction without significance. The reception area in Fowler was not accessible to the public, so the people who were "coming and going" through the area would have been officers or other government employees, and, in general, many police officers are present in and around police stations. In point of fact, D.M. and Mother arguably had more privacy and less intimidating surroundings than the juvenile in Fowler because they were left alone in a car through which people were not "coming and going" and were in the familiar surroundings of their neighborhood, rather than the unfamiliar atmosphere of a police station. Mother's concern that they were being recorded is not relevant here to whether the police complied with the requirement – Quigley told them that he would not record their private conversation and there is no evidence that he was attempting to trick them. Furthermore, had he recorded them, the confession would have been excluded under the precedent of the Court of Appeals. See Bryant v. State, 802 N.E.2d 486, 494 (Ind. Ct. App. 2004) (secretly recording consultation was impermissible police presence), trans. denied; see also S.D. v. State, 937 N.E.2d 425, 431 (Ind. Ct. App. 2010) (videotaping consultation was impermissible police presence), trans. denied. Finally, the alleged conduct of the firefighters prior to the consultation does not amount to impermissible police pressure because they were on scene in their capacity as private citizens and friends of the victim. It would certainly be inappropriate for the police to require a juvenile's consultation with a parent to occur in the midst of a mob of private citizens who were threatening, harassing, or intimidating them or exhibiting other characteristics of a mob mentality. Cf. Chambers v. Florida, 309 U.S. 227 (1940) (reversing convictions on due process grounds where defendants were interrogated in small rooms by up to ten people, including private citizens). After all, the touchstone of the consultation requirement is privacy. But there is nothing in the record to suggest that D.M. and Mother were deprived of a private conversation by the actions of the police or anyone else.[13]

Finally, relying on Garrett v. State, 265 Ind. 63, 351 N.E.2d 30 (1976), D.M. argues that the consultation was not meaningful because it was too short and because Mother was unable to serve in an advisory capacity since she had been told that she had to sign a waiver to talk to D.M.

---

[13] Our conclusion that they had ample privacy is buttressed by the fact that the record bears no indication of what was actually said between D.M. and Mother.

and since she was not informed of the purpose for the consultation.[14] But the only similarity between this case and <u>Garrett</u> is that they both involve juvenile confessions.[15] Although the record is unclear as to exactly how long D.M. and Mother talked, after "several minutes" it was terminated by Mother, not the police, and there is no evidence to suggest that Quigley caused Mother to end the conversation prematurely. And, as discussed <u>supra</u>, the juvenile court reasonably could have concluded that Mother's testimony was not credible or that the actual procedure used by Quigley was sufficient to clarify any prior ambiguity. Finally, assuming that the police are required to inform the parent of the reason for the consultation,[16] the record reflects that Mother was so advised – the last sentence of the advisement of rights provided that the purpose of allowing her and D.M. to talk was "to discuss the waiver of [D.M.'s] rights before signing the waiver of rights." State's Ex. 4.

In sum, there is substantial evidence of probative value that D.M. and Mother were afforded an opportunity for meaningful consultation free from police pressure. The meaningful consultation requirement is a safeguard in addition to <u>Miranda</u> intended to ensure that police action does not overcome the juvenile's will and result in a compelled statement. Mother's apparent reluctance to engage in any meaningful dialogue with D.M. concerning D.M.'s rights and the

---

[14] D.M. also argues that Mother was too stressed, confused, and concerned to serve in an advisory capacity, but nothing in the record suggests that her stress, confusion, and concern were anything different from the natural reaction most parents would have upon learning that their child had been arrested. Cf. <u>Trowbridge</u>, 717 N.E.2d at 146.

[15] In <u>Garrett</u>, we held that a sixteen-year-old mentally challenged murder suspect's consultation was too short and perfunctory to be deemed adequate because he and his mother were not permitted to talk privately until after they signed a waiver of his rights, at which point they were alone for only a moment while the officer left the room to fetch the mother a cup of coffee, and nobody had told them that they should take that moment to consult with each other. 265 Ind. at 68-69, 351 N.E.2d at 33-34. Additionally, the form the mother signed designated her as a mere witness, which obfuscated the advisory role she was supposed to play, and the police had interrogated the defendant twice before his mother arrived (the defendant had been in custody for 28 hours), and they had encouraged the mother to have her son tell the truth. <u>Id.</u>

[16] We have never expressly held that the juvenile and his or her parent must be informed of the purpose for the consultation. In fact, we have held that the police cannot dictate or recommend how the consultation time should be used, <u>e.g.</u>, <u>Trowbridge</u>, 717 N.E.2d at 148, and we have been reluctant to impose affirmative requirements on the police beyond the duty to provide an opportunity for private consultation free from police pressure and to ensure that the child and parent understand the child's rights so that they <u>can</u> have an intelligent discussion, <u>e.g.</u>, <u>Patton</u>, 588 N.E.2d at 496 (holding that police are not required to leave waiver form with parent and juvenile).

waiver of those rights was not due to any police pressures. Rather, the police provided D.M. an opportunity for meaningful consultation with his custodial parent before the waiver of his rights.

**B**

D.M. also challenges the juvenile court's decision to admit his confession on grounds that the State failed to carry its burden in proving that the waiver of his rights was knowing, intelligent, and voluntary, repeating most of the arguments he made concerning the consultation requirement. Where juvenile waivers are concerned, Indiana Code section 31-32-5-1 requires that both the juvenile and his or her parent voluntarily waive the juvenile's rights. I.C. § 31-32-5-1(2)(A), (D); Stewart, 754 N.E.2d at 494-95. Thus, assessing the validity of a juvenile's waiver requires conducting two separate voluntariness analyses – the voluntariness of the juvenile's waiver and the voluntariness of the parent's waiver.[17] See, e.g., Trowbridge, 717 N.E.2d at 146-48. D.M. challenges the voluntariness of his waiver only; he has not challenged the voluntariness of Mother's waiver.[18]

An express oral or written statement is not required to establish a knowing and voluntary waiver of rights – valid waivers may be implied. Berghuis v. Thompkins, 130 S. Ct. 2250, 2261 (2010); North Carolina v. Butler, 441 U.S. 369, 373 (1979). A written waiver, however, is certainly strong proof that a valid waiver occurred, Butler, 441 U.S. at 373, but, when challenged, the State may be required to tender additional proof of voluntariness, Ringo v. State, 736 N.E.2d 1209, 1212 (Ind. 2000). Thus, a written waiver is neither necessary nor sufficient to establish that a person voluntarily waived his or her Miranda rights. Butler, 441 U.S. at 373. Generally, a valid implied waiver occurs where a suspect who has been advised of his or her Miranda rights and has acknowledged an understanding of those rights makes an uncoerced statement without

---

[17] In many, if not most, cases, the analyses for both waivers are nearly identical because both the juvenile and the parent are subject to the same circumstances. In some cases, however, the parent and the juvenile are not in the exact same situation, such as the present case, in which uniformed officers are alleged to have made certain statements to Mother that were not made to D.M.

[18] Although D.M. mentions Mother's waiver once or twice in his briefs, that issue is not available for review because he failed to provide argumentation concerning Mother's waiver. E.g., Allen v. State, 686 N.E.2d 760, 769 n.3 (Ind. 1997).

taking advantage of them.  Thompkins, 130 S. Ct. at 2262; Moran v. Burbine, 475 U.S. 412, 421-23 (1986); Crain v. State, 736 N.E.2d 1223, 1230 (Ind. 2000).

In determining the voluntariness of a Miranda waiver, we examine the totality of the circumstances surrounding the interrogation to determine whether the suspect's choice "was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and whether the waiver was "made with a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]."  Burbine, 475 U.S. at 421; see also Crain, 736 N.E.2d at 1230 (reviewing totality of the circumstances to ensure that waiver was "not induced by violence, threats, or other improper influences that overcame the defendant's free will"); cf. Michael C., 442 U.S. at 725 (holding that the totality-of-the-circumstances test applies to juvenile waivers).  Relevant considerations include the juvenile's physical, mental, and emotional maturity; whether the juvenile or his or her parent understood the consequences of the juvenile's statements; whether the juvenile and his or her parent were informed of the delinquent act for which the juvenile was suspected; the length of time the juvenile was held in custody before consulting with his or her parent; whether there was any force, coercion, or inducement; and whether the juvenile and his or her parent had been advised of the juvenile's Miranda rights.  I.C. § 31-32-5-4; see also Michael C., 442 U.S. at 725-27.

The totality of the circumstances surrounding the interrogation of D.M. supports the juvenile court's conclusion that he knowingly, intelligently, and voluntarily waived his rights.  Although the record is unclear, the juvenile court reasonably could have concluded that Mother had been informed of the reason for the arrest when the uniformed officer came to her house, particularly since no claim has been made that she was unaware of the reason.  D.M. was detained for only two hours, at the most, before he was permitted to talk to Mother.  Furthermore, both D.M. and Mother were advised of D.M.'s Miranda rights, and they acknowledged an understanding of those rights, signed the advisement section of the juvenile waiver form, consulted with each other in private, and read and signed the actual waiver of rights.  They never asked any questions concerning D.M.'s rights, and they never displayed any hesitation or uncertainty with regard to the rights or the procedure used.  Moreover, they never invoked D.M.'s rights; rather, D.M. gave a detailed confession in response to Quigley's first question.  D.M. was a thirteen-year-old se-

venth grader when he was interrogated. Although he had had no previous experience with law enforcement or the criminal justice system, there is no evidence that his mental and emotional maturity were hindered by anything other than his youth, and he was given an opportunity for meaningful consultation with Mother, which is intended to neutralize the additional pressures that result from a juvenile's youth and immaturity. And there is no indication that the opportunity for consultation did not heighten D.M.'s awareness of his rights and the ramifications of waiving them.[19] Cf. Fortson, 270 Ind. at 299, 385 N.E.2d at 436.

D.M. argues that his waiver was involuntary because it was obtained through force, coercion, or inducement. The presence or lack of police coercion is an important factor in assessing the voluntariness of waiver. But the existence of some modicum of police coercion or pressure does not necessarily lead to a finding of involuntariness. Rather, such coercion is considered in light of the totality of the circumstances, and it is possible that other factors will neutralize or remedy such coercion.

Similar to his challenges to the consultation, D.M. argues that the waiver was obtained through an improper inducement because uniformed officers allegedly told Mother that she was required to waive D.M.'s rights in order to speak with him. As noted in Part I-A, supra, we cannot characterize Mother's testimony as uncontested. But even accepting her testimony as true, there is no evidence of police coercion sufficient to render the waiver of D.M.'s rights involuntary under the totality of the circumstances. It is well-settled that matters of which a suspect is unaware are not relevant to whether the suspect knowingly, intelligently, and voluntarily waived his or her rights. Cf. Burbine, 475 U.S. at 422; Ajabu, 693 N.E.2d at 932-34. Accordingly, the alleged statements are not relevant to the voluntariness of D.M.'s waiver because they were alleged to have been made to Mother, not D.M., and there is no evidence that he heard them from the backseat of the police cruiser in which he was being detained. D.M. has not challenged the voluntariness of Mother's waiver, but our conclusion on this record would be no different had he done so. The officers' alleged statements are merely ambiguous in light of the waiver form used because Mother did sign it before talking to D.M. privately, but at that point she had not waived

---

[19] Despite his challenges to the consultation, there is no record of what he and Mother discussed. D.M. did not to testify, and Mother testified simply that "I just talked to my son for a few minutes." Tr. 33.

14

any rights. In point of fact, Mother and D.M. did not waive D.M.'s rights until after they were advised of those rights and had had an opportunity for meaningful consultation. Thus, in considering the totality of the circumstances, the juvenile court reasonably could have concluded that any confusion created by the officers' alleged statements was sufficiently cleared up by the procedure actually utilized by Quigley.

Additionally, D.M. argues that the atmosphere was intimidating and coercive. Importantly, this is not a case where the police attempted to wear down the juvenile's will by subjecting him to prolonged interrogation or holding him incommunicado. Cf. Gallegos v. Colorado, 370 U.S. 49 (1962); Haley v. Ohio, 332 U.S. 596 (1948) (plurality opinion). And the inherent coerciveness of a custodial interrogation is minimized when the police adhere to the dictates of Miranda and the meaningful consultation requirement. There is no evidence that the presence or alleged actions of the firefighters, whom D.M. concedes were present in their capacities as private citizens, had any impact on him or that he was ever aware of anything they said or did. And both he and Mother were advised of his Miranda rights, acknowledged that they understood them, and had an opportunity for consultation free from coercive pressures before waiving D.M.'s rights, and it is undisputed that D.M.'s confession was uncoerced. Cf. Thompkins, 130 S. Ct. at 2262.

In sum, there is substantial evidence of probative value that D.M.'s rights were waived knowingly, intelligently, and voluntarily under the totality of the circumstances. Accordingly, the juvenile court did not err in admitting D.M.'s confession.

## II

The dispute in this case may have been averted had the juvenile waiver form been clearer. Although the form was not so deficient that it violated the constitutional requirements of Miranda or the essential statutory requirements of Indiana Code section 31-32-5-1, it could have provided more accurate and clear guidance such that there would be no dispute here.

At the top of the form, the words "JUVENILE WAIVER" are printed in large, approximately 40-point, font size using all capital letters. The form itself is divided into two parts: the top part of the form is the "Warning of Rights" ("advisement section"), and the bottom part of the form is the "Waiver" ("waiver section").

We perceive several deficiencies with the waiver form. First, and most important, is the last sentence of the advisement section – "My parents and/or legal guardian and I <u>have been</u> allowed time by ourselves without the presence of a police officer to discuss the waiver of my rights before signing the waiver of rights." By using the past tense "have been," the form suggests that the opportunity for consultation occurred before the advisement, or at least before signing the acknowledgment of the advisement. But in this case, the opportunity for consultation occurred <u>after</u> the advisement and <u>before</u> the waiver. This is as it should be. In fact, a consultation can only be meaningful where both the juvenile and the parent are advised of the juvenile's rights prior to the consultation:

> To ensure that a juvenile's waiver of constitutional rights is voluntary, <u>Lewis</u> prescribed the procedural safeguards to be followed by the police. First, <u>both the juvenile and the parent or guardian must be informed of the right to an attorney and the right to remain silent</u>. Second, the juvenile must be given a meaningful opportunity to consult with his [or her] parent, guardian or attorney about the waiver decision. A meaningful opportunity for the parent-juvenile consultation requires timeliness: pursuant to <u>Lewis</u>, <u>the consultation must occur after the advisement of rights but prior to the decision to execute a waiver and make a statement</u>. To be meaningful, the consultation must be held in the absence of pressures which result from police presence.

<u>Douglas</u>, 481 N.E.2d at 111 (emphasis added) (citation omitted).[20]

This deficiency can be remedied simply by changing the past tense to the present or future tense: "My parents and/or legal guardian and I <u>will be</u> allowed time by ourselves without the presence of a police officer to discuss the waiver of my rights before signing the waiver of rights."

---

[20] We acknowledge that there is dicta in <u>Cherrone v. State</u>, 726 N.E.2d 251, 255 n.1 (Ind. 2000), and <u>Brown</u>, 751 N.E.2d at 670, indicating that it remains an open question as to whether a consultation can be meaningful when it occurs before the parent has been advised of the juvenile's rights. We disavow these dicta to the extent that they conflict with <u>Douglas</u>.

A second deficiency in the waiver form involves its style and presentation. The form contains both an advisement-of-rights section and a waiver-of-rights section. But the title of the form is "JUVENILE WAIVER," and it is emblazoned across the top of the page in font that is more than three times larger than any other font. This is bound to cause confusion, especially in cases like the present one where a parent is allegedly told by officers that he or she must "sign a waiver" before speaking to the juvenile. Such statements are ambiguous because the form is titled "Juvenile Waiver" and the parent signs the form before speaking to his or her child, but this signature does not waive any rights. Alternatively, such statements by officers could mean that the parent has to waive the child's rights before speaking with the child, which is clearly incorrect under Indiana law. The form itself does nothing to dispel this ambiguity when it is titled, in large font and all capital letters "JUVENILE WAIVER." The more accurate title for such a form is "Juvenile and Parent (or Guardian) Advisement & Waiver of Rights." Related to this is the subheading "Warning of Rights," which sounds and looks similar to "Waiver of Rights." It would therefore be clearer to use a subheading such as "Advisement of Rights" for the top part of the form and "Waiver of Rights" for the bottom part of the form. Finally, instead of the officer acknowledging these signings only at the end of the form (after both the advisement and waiver), the officer should separately acknowledge both sets of signatures and provide the time at which each occurred.

Lastly, the waiver section does not clearly indicate that both the juvenile and the parent are required to waive the juvenile's rights. The three statements are phrased such that they apply only to the juvenile, which suggests that it is only the juvenile who is waiving his or her rights. To be sure, the signature line requires the signature of the parent, rather than a mere witness. Cf. Garrett, 351 N.E.2d at 33. But the form could more clearly indicate the parent's role.

Written waiver forms are not required to satisfy the constitutional demands of Miranda or the statutory requirements of Indiana Code section 31-32-5-1, but they are particularly strong evidence.[21] When they are used, they should be clear and unequivocal. Had a clearer form been

---

[21] We request that the Judicial Conference of Indiana's Juvenile Justice Improvement Committee develop a form for juvenile and parent (or guardian) advisement and waiver of rights.

used in this case, any putative confusion likely would have been resolved as soon as the form was read by D.M. and Mother. A clear form following the guidelines provided here should serve to clarify any ambiguities that arise prior to signing the form and thereby prevent a court from undertaking an in-depth look at how ambiguous and innocent pre-custodial-interrogation occurrences affect the actual custodial interrogation and the requisite procedures applicable to such interrogation.

## Conclusion

We affirm the juvenile court's decision to admit D.M.'s confession and its finding that D.M. is a delinquent child for committing acts that would have been felonies if they had been committed by an adult.

Shepard, C.J., and Dickson and David, JJ., concur.

Rucker, J., concurs in result.