

FILED

Jan 23 2020, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. Mackenzie
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

C.J.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

January 23, 2020

Court of Appeals Case No.
19A-JV-255

Appeal from the Marion Superior
Court

The Honorable Marilyn Moores,
Judge
The Honorable Geoffrey Gaither,
Magistrate

Trial Court Cause No.
49D09-1810-JD-1192

**May, Judge.**

[1] The trial court adjudicated C.J. as a delinquent for acts that would constitute Level 4 felony child molesting[1] if committed by an adult. He raises one issue on appeal, which we restate and expand to two issues: (1) whether the trial court abused its discretion by admitting evidence collected during an interrogation of C.J. because C.J. had not knowingly, intelligently, and voluntarily waived his constitutional rights before being interrogated by a police officer, and (2) whether there is sufficient evidence to support the true finding without considering the evidence derived from the interrogation. We reverse.

## Facts and Procedural History[2]

[2] C.J., a twelve-year-old boy, lived in Indianapolis with his Mother, Stepfather, four-year-old sister A.T., and eleven-year-old brother A.J. In October 2018, A.J. walked into a bedroom and saw A.T. with her pants down and C.J.'s face close to her rear end. A.J. told Mother what he saw. Mother called a "crisis hotline" and then took the children to the hospital. (Tr. Vol. II at 15.) Medical personnel performed a sexual assault assessment on A.T. but did not discover any signs of trauma. Hospital staff contacted the Indiana Department of Child Services ("DCS"), and DCS contacted law enforcement. Around 3 p.m. the

---

[1] Ind. Code § 35-42-4-3(b).

[2] We heard oral argument in this matter on December 5, 2019, in Indianapolis. We commend counsel for their able presentations.

next day, Mother and the three children went to the Indianapolis Metropolitan Police Department to speak with Detective Eli McAllister.

[3] Detective McAllister escorted C.J. to a room in the police station and left him alone for approximately fifty minutes. While waiting, C.J. sprawled on the floor, curled up into his shirt, drummed on the seat of a chair, sang, and played with his sock. Eventually, Mother and Detective McAllister entered the room, and Detective McAllister acknowledged that C.J. was "tired and sleepy." (State's Ex. 3 at 15:20:55.)[3] He told C.J. that it was C.J.'s decision whether to talk with him. C.J. and Detective McAllister then proceeded to talk about C.J.'s school, hobbies, chores, and bikes.

[4] After a few minutes of informal conversation, Detective McAllister redirected the conversation to C.J.'s interactions with A.T. the night before by saying: "Hey man, I think you know why you're here today." (*Id.* at 15:31:20.) Detective McAllister then proceeded to review the waiver of rights form with C.J. and Mother. The waiver of rights form stated:

> ***Before*** *we ask you any questions, you must understand your rights.*
>
> 1. *You may have one or both of your parents present.*
>
> 2. *You have the right to remain silent.*

---

[3] The timestamps represent the actual time of day the recording was recorded as measured by a 24-hour clock. The time is shown on the camera display of the video.

3. *Anything you say can be used as evidence against you in court.*

4. *You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.*

5. *If you cannot afford a lawyer and you want one, one will be appointed for you by the court before questioning.*

6. *If you decide to answer questions now, without a lawyer present, you will still have the right to stop answering at any time. You will also [have] the right to stop answering at any time until you talk to a lawyer.*

(State's Ex. 1) (emphasis in original).

[5]     Detective McAllister read each line of the waiver form and waited for C.J. and Mother to acknowledge that they understood. At times, C.J. interrupted Detective McAllister to talk about police television shows. C.J. also asked for and received clarification from Detective McAllister regarding rights 5 and 6. Detective McAllister assured C.J. and Mother that they would have time alone and unrecorded to discuss whether C.J. wished to waive his rights. Both C.J. and Mother signed the waiver of rights form acknowledging they had read and understood the six rights listed above.

[6]     Detective McAllister then took C.J. and Mother to a room where they could consult in private. Detective McAllister reentered the interrogation room, and

C.J. and Mother returned to the interrogation room a short time later.[4] Upon returning to the room, Detective McAllister indicated Mother informed him off camera that C.J. wanted to talk to him without Mother present, and C.J. confirmed he wanted to talk to Detective McAllister alone. Detective McAllister then went over the final three warnings on the waiver of rights form with both C.J. and Mother, which stated:

1. *I have read the above rights and I understand and know what I am doing.*

2. *We have been allowed time to consult without a police officer present.*

3. *I expressly waive the above rights.*

(State's Ex. 1) (emphasis in original). C.J. asked about the meaning of the word "expressly." (State's Ex. 3 at 15:43:32.) Detective McAllister clarified the term, and both C.J. and Mother signed the waiver of rights form. Detective McAllister and Mother then exited the interrogation room so that Detective McAllister could escort Mother back to the front of the police station. While

---

[4] The parties disagree in their briefs about how long the consultation between Mother and C.J. lasted. C.J. asked to use the restroom as he left the interrogation room, and presumably, he used the bathroom before meeting with Mother to discuss his waiver of rights. C.J. argues the consultation with Mother lasted only 23 seconds; whereas, the State maintains the consultation was for approximately 2 minutes and 15 seconds. C.J. calculates the length of time by comparing the timestamp for when Detective McAllister re-entered the interrogation room after escorting Mother and C.J. out of the room with the timestamp for when Mother and C.J. indicated they were ready to return. The State calculates the length of time by comparing the timestamp for when C.J., Mother, and Detective McAllister left the interrogation room with the timestamp for when C.J. and Mother re-entered the interrogation room.

alone in the interrogation room, C.J. hummed, moved chairs, danced, clapped, and laughed.

[7] Detective McAllister returned and resumed the interrogation with C.J. alone. C.J. initially denied touching A.T. C.J. talked about cars, his difficulties spelling and reading, and fights with other children at his school. Over the course of the interrogation, Detective McAllister accused C.J. of lying and stated that he knew what really happened. C.J. eventually admitted touching and licking A.T.'s rear end. C.J. also acknowledged he might have touched her vagina.

[8] C.J. told Detective McAllister he realized he would likely get into trouble when A.J. walked in on C.J. and A.T. Detective McAllister asked C.J. if C.J. knew better than to touch and lick A.T.'s rear end, and C.J. acknowledged that he did know better. C.J. claimed he did it even though he knew better because A.T. asked him to. Detective McAllister asked C.J.: "Why do you think you . . . shouldn't have done that stuff? Shouldn't have touched her or licked her down there?" (*Id*. at 16:19:05—16:19:10.) C.J. shrugged, and Detective McAllister continued, "What reason? Why is it wrong?" (*Id*. at 16:19:11 – 16:19:15.) C.J. characterized his behavior as "bad" but could not give a reason why it was bad. (*Id*. at 16:19:35-16:20:00.) Detective McAllister then suggested that A.T.'s age, A.T.'s lack of maturity, and A.T. being not as big as C.J. were why the behavior was wrong.

[9]     C.J. was arrested and charged with acts that, if committed by an adult, would constitute Level 3 felony child molesting[5] and Level 4 felony child molesting. The juvenile court held a delinquency hearing on January 3 and 4, 2019. Mother, A.J., A.T., and Detective McAllister testified at the hearing. At the hearing, Mother testified that:

> Detective [McAllister] was really uh let me think of the word---convincing on why I should let [C.J.] talk to him by himself and that he felt it would be best for him to talk to [C.J.] by himself and at that point, I felt like he was friendly towards me and that he wanted the best interest and so I allowed that but now that all of this has happened, I wish I wouldn't have.

(Tr. Vol. II at 18.) Mother also testified that C.J. told her he did not understand the rights on the waiver form, but she did not testify as to when or where C.J. told her he did not understand. At the conclusion of the hearing, the State dismissed the Level 3 felony child molesting allegation, and the court entered a true finding as to the Level 4 felony. The court placed C.J. on probation and ordered placement at a behavior health services provider as a condition of probation.

# Discussion and Decision

[10]     C.J. challenges the trial court's admission of evidence collected during his interrogation by Detective McAllister. Trial courts retain broad discretion in

---

[5] Ind. Code § 35-42-4-3.

ruling on the admission of evidence, and we will reverse only upon finding an abuse of discretion. *S.G. v. State*, 956 N.E.2d 668, 674 (Ind. Ct. App. 2011), *trans. denied*. An abuse of discretion is "a decision that is clearly against the logic and effect of the facts and circumstances before the court." *Id*. However, when the issue is one of constitutional law, as in the case at bar, we review the claim *de novo*. *See Brittain v. State*, 68 N.E.3d 611, 616-17 (Ind. Ct. App. 2017), *trans. denied*.

[11] C.J. argues his statements should not have been admissible because he did not knowingly and voluntarily waive his privilege against self-incrimination. The Fifth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment, and Article I, Section 14 of the Indiana Constitution protect Indiana citizens from self-incrimination and prohibit the use of involuntary statements against a criminal defendant. *D.M. v. State*, 949 N.E.2d 327, 332 (Ind. 2011). These protections apply not only in court proceedings but also during custodial interrogations. *Id*. at 333.

[12] In the context of juvenile interrogations, Indiana law requires additional procedural safeguards beyond those required by *Miranda v. Arizona*, 384 U.S. 436 (1966).[6] *Id*. Indiana Code section 31-32-5-1(2) governs the waiver of juvenile rights during interrogation, and that statute states in relevant part:

---

[6] As stated in *Miranda*, the subject of a custodial interrogation must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:

* * * * *

(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:

> (A) that person knowingly and voluntarily waives the right;

> (B) that person has no interest adverse to the child;

> (C) meaningful consultation has occurred between that person and the child; and

> (D) the child knowingly and voluntarily joins with the waiver[.]

Ind. Code § 31-32-5-1(2).

[13] Regarding these requirements, our Indiana Supreme Court has explained that before a juvenile's statements can be used in the State's case-in-chief:

> First, both the juvenile and his or her parent must be adequately advised of the juvenile's rights. Second, the juvenile must be given an opportunity for meaningful consultation with his or her parent. Third, both the juvenile and his or her parent must knowingly, intelligently, and voluntarily waive the juvenile's rights. Finally, the juvenile's statements must be voluntary and not the result of coercive police activity.

*D.M.*, 949 N.E.2d at 334 (footnotes and internal citations omitted).  The State must prove beyond a reasonable doubt that the juvenile received all the protections listed in Indiana Code section 31-32-5-1 and that both the juvenile and his parent knowingly, intelligently, and voluntarily executed the waiver. *Id*.

## 1. Both juvenile and parent must knowingly, intelligently, and voluntarily waive the juvenile's rights.

[14]  Our over-arching analysis focuses primarily on the third condition listed in *D.M.*, whether C.J.'s waiver was knowing, intelligent, and voluntary.  We evaluate the validity of a *Miranda* waiver by looking at the totality of the circumstances.  *Id*. at 339.  This includes considering the juvenile's physical, mental, and emotional maturity; whether the juvenile or his parent understood the consequences of speaking with law enforcement; whether the juvenile and his parent were informed of the delinquent act for which the juvenile was suspected; the length of time the juvenile was held in custody before consulting with his parent; whether law enforcement used any force, coercion, or inducement; and whether the juvenile and his parents had been advised of the juvenile's *Miranda* rights.  *Id*. at 339-340.

### A. C.J.'s physical, mental, and emotional maturity and understanding of consequences.

[15]  C.J. contends he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.  In *J.D.B. v. North Carolina*, the Supreme Court of the United

States observed that there are "coercive aspects" to any police interrogation of a suspect. 564 U.S. 261, 268 (2011). These pressures associated with custodial interrogation can induce individuals, and particularly juveniles, to make false confessions. *Id*. at 269. Therefore, the *Miranda* warnings are "designed to safeguard the constitutional guarantee against self-incrimination." *Id*.

[16] C.J. argues that "[a]s a low-functioning twelve-year-old, he did not and could not understand the nature of the rights being waived." (Appellant's Br. at 11.) Mother testified C.J. had an IQ of 70. During the interrogation, C.J.'s speech was stunted, he used poor grammar, and he talked about unrelated topics, like cars and television shows. While waiting to be interrogated by Detective McAllister, C.J. exhibited immature behavior by sprawling on the floor, drumming on the seat of his chair, and singing. Even when C.J. was left alone in the interrogation room after Detective McAllister read the waiver of rights to C.J. and C.J. waived his rights, C.J. hummed, moved chairs, danced, clapped, and laughed.

[17] C.J.'s behavior was not that expected of someone who understands he is being questioned about a serious crime. In its dispositional decree, the trial court found C.J. "has special needs that require services for care and treatment that cannot be provided in the home." (App. Vol. II at 174.) Further, the court found C.J. "often displays inappropriate and immature behaviors, which negatively affects his ability to build and maintain relationships with other children. He does not demonstrate empathy toward adults or other children,

and demonstrates significant difficulty understanding how his behavior impacts others." (*Id.*)

### B. Whether C.J. and Mother were informed of the delinquent act of which C.J. was suspected.

Moreover, C.J. was never informed of the delinquent act of which he was suspected or of the potential consequences. After the interrogation, C.J. asked the arresting officer where he was being taken. There is no evidence C.J. recognized he was being asked about criminal activity during the interrogation. Detective McAllister did not specify the crime C.J. was suspected of committing, and C.J. did not exhibit an independent understanding that he was being accused of a crime. C.J. characterized licking and touching A.T. as "bad" but could not articulate why it was wrong. (State's Ex. 3 at 16:19:00-16:20:00.) Parents often discipline children for behaviors that are not criminal, and children can disobey their parents without breaking the law. Therefore, C.J.'s mere recognition that he would likely get into trouble does not automatically equate to an appreciation for the illegal nature of his conduct.

### C. Advisement of Rights

Detective McAllister did read all the warnings on the waiver of rights form to C.J. and Mother before asking C.J. questions. C.J. and Mother both had copies of the waiver of rights form and were able to follow along as Detective McAllister read the form. When C.J. asked questions about the form, Detective McAllister answered his questions. However, in *Berghuis v. Thompkins*, the United States Supreme Court observed that "[i]f the State establishes that a

*Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone is insufficient to demonstrate a valid waiver of *Miranda* rights. The prosecution must make the additional showing that the accused understood these rights." 560 U.S. 370, 384 (2010) (internal citation and quotation marks omitted). The State failed to make the additional showing required by *Berghuis.*

### D. Consultation with Mother

[20] Finally, we note the *de minimis* consultation that occurred between C.J. and Mother. In *D.M.*, our Indiana Supreme Court stated that for the purpose of meeting the statutory requirement that there be a meaningful consultation between the juvenile and parent, "the State needs only to prove that the police provided a relatively private atmosphere that was free from police pressure in which the juvenile and the parent could have had a meaningful discussion[.]" 949 N.E.2d at 335. Mother and C.J. were provided an opportunity to discuss whether C.J. should waive his rights. The State does not need to prove that the consultation was beneficial. *Id*. at 336. However, "the extent to which the conversation aids in the waiver decision 'is a circumstance among many others which the trial court may consider in arriving at its decision as to whether the waiver is voluntary and knowing.'" *Id*. (quoting *Fortson v. State*, 385 N.E.2d 429, 436 (Ind. 1979), *reh'g denied*). The brevity of the conversation between C.J. and Mother impacts whether C.J.'s waiver was knowing and intelligent because we expect people facing consequential decisions to take time to contemplate their options before making a decision.

After considering the totality of the circumstances, we cannot say that C.J.'s waiver of his rights was knowing, intelligent, and voluntary because of his demonstrated lack of maturity, the fact that he was not advised of the crime and possible consequences, and his minimal consultation with Mother. Therefore, we hold the trial court erred in admitting as evidence the videotape of C.J.'s interrogation and Detective McAllister's testimony regarding C.J.'s statements during the interrogation. *See Stewart v. State*, 754 N.E.2d 492, 496 (Ind. 2001) (holding trial court committed reversible error in admitting defendant's confession that was obtained in violation of the juvenile waiver statute).

## 2. Sufficiency of the Evidence

Because that evidence was inadmissible, we must review whether the record contains sufficient other evidence to support C.J.'s adjudication as a delinquent for committing an act that would be Level 4 felony child molesting. Indiana Code Section 35-42-4-3 provides:

> A person who, with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or satisfy the sexual desires of either the child or the older person, commits child molesting, a Level 4 felony.

At oral argument, the State explained that if the confession is deemed inadmissible, it would still have the diagram C.J. marked during the interrogation, the information provided by Mother, and the testimony of C.J.'s brother, A.J. However, because we have concluded that C.J. did not

knowingly waive his rights prior to the interrogation, the diagram C.J. marked during the interrogation is also inadmissible as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487 (1963) (holding defendant's declarations were inadmissible as fruit of an unlawful entry). Mother testified that A.J. came to her "surprised." (Tr. Vol. II at 12.) She further stated, "[A.J.] didn't specifically state sexual things had happened. He just said that his brother had touched his sister." [7] (*Id*. at 13.) Mother did not observe the alleged inappropriate touching between C.J. and A.T. A.J. testified that he "walked into the room and [he] saw [A.T.'s] pants down with [C.J.]'s face close to her butt." (*Id*. at 34.) A.J. did not testify at the hearing that he saw C.J. touch A.T. Simply put, there is no evidence of any fondling or touching with intent to arouse or satisfy any sexual desire. Therefore, there is insufficient evidence to support the true finding without C.J.'s confession, and we reverse the true finding of the trial court. *See Hill v. State*, 956 N.E.2d 174, 179 (Ind. Ct. App. 2011) (holding there was insufficient evidence to support defendant's conviction without evidence obtained during an illegal pat-down search), *trans. denied*.

# Conclusion

---

[7] C.J.'s counsel entered a continuing objection on hearsay grounds to Mother's testimony about what A.J. told her he saw, but the trial court overruled the objection.

C.J.'s waiver was not valid because the totality of the circumstances demonstrates he did not knowingly, intelligently, and voluntarily join the waiver. Therefore, the trial court abused its discretion in admitting into evidence the information gathered during that interrogation, and we reverse C.J.'s adjudication as a delinquent because the record contains no evidence to support it.

Reversed.

Najam, J., and Bailey, J., concur.