Douglas **BROWN**, Appellant
(Defendant below),

v.

**STATE of Indiana,** Appellee
(Plaintiff below).

No. 49S00–0004–CR–256.

Supreme Court of Indiana.

July 19, 2001.

Katherine A. Cornelius, Indianapolis, IN, Attorney for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Adam M. Dulik, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Defendant Douglas Brown was convicted of murder for shooting another man to death. In affirming his conviction, we agree with the trial court that the prosecution offered sufficient race-neutral justifications for peremptorily excluding two potential African–American jurors; that Defendant was provided with his statutory right to consult with his father; and that there was no evidence to support instructing the jury on voluntary manslaughter.

### Background

The facts most favorable to the verdict show that on December 26, 1998, Defendant shot one Porter Moore outside an Indianapolis home from which Moore sold

drugs. That evening, Moore drove to the house with some friends and went inside while his companions remained in the car. Soon after Moore went into the house, Defendant and another man approached the occupants of Moore's car and asked where they could find a friend of Defendant's named Roosevelt Caruthers. Moore's friends replied in a rude manner. Defendant later told police that he had witnessed Caruthers argue with several of Moore's associates at the house earlier in the day. Defendant told police he came to the house in order to find Caruthers.

After his confrontation with the occupants of the car, Defendant walked towards the house. At this time, Moore left the house and passed by Defendant. Defendant made a comment to Moore about the occupants of the car, to which Moore made no reply. This lack of response apparently insulted Defendant. He cocked a gun, pointed it at Moore, and pulled the trigger. The gun misfired. Defendant later told police that Moore's eyes bulged like he was angry or scared. Moore then dove into his car. Defendant fired again, this time striking Moore in the face and killing him.

Defendant was charged with Murder [1] and Carrying a Handgun without a License.[2] A jury convicted him on both counts and the trial court sentenced him to 60 years on the murder charge and 365 days for the handgun offense, which was to be served concurrently with the murder sentence.

*Discussion*

I

■ Defendant argues that his conviction must be reversed because the prosecutor made what he contends were racially-based peremptory challenges in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* held that a State denies a "defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Id.* at 85, 106 S.Ct. 1712. For that reason, a litigant may not use peremptory challenges "to exclude potential jurors from serving solely because of race." *Williams v. State,* 700 N.E.2d 784, 786 (Ind.1998). *See also Willoughby v. State,* 660 N.E.2d 570, 578 (Ind.1996) ("Race-based peremptory challenges are a form of racial discrimination which the State cannot condone.").

■ To contest an opposing party's use of peremptory challenges under *Batson,* a litigant must "establish a prima facie case of racial discrimination." *Lee v. State,* 689 N.E.2d 435, 440–41 (Ind.1997), *reh'g denied.* The moving party will make out such a prima facie case by showing "(1) that the prosecutor used peremptory strikes to remove members of a cognizable racial group from the jury pool; and (2) that the facts and circumstances raise an inference that the prosecutor used those strikes to exclude potential jury members from the jury because of their race." *Williams,* 700 N.E.2d at 786. Once the moving party establishes this prima facie case, the burden of production shifts to the non-moving party, who must "provide a race-neutral explanation for challenging [a] juror." *McCants v. State,* 686 N.E.2d 1281, 1284 (Ind.1997). This "second step of [the *Batson* ] process does not demand an explanation that is persuasive, or even plausible ...." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curium). Instead, the prosecutor must provide a fa-

---

**1.** *See* Ind.Code § 35–42–1–1 (1998).

**2.** *See id.* § 35–47–2–1.

cially valid explanation for the use of the peremptory challenge and " '[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.* at 768, 115 S.Ct. 1769 (quoting *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)). Although the burden of production shifts to the non-moving party to present a facially valid reason for the peremptory challenge, the moving party retains the overall burden of proof to establish "purposeful discrimination." *Id.*

Defendant claims the State violated these principles by using peremptory challenges to remove two black women from the jury.[3] The trial court concluded that Defendant made a prima facie case that the challenges were based on race and the State does not contest this conclusion. *See* Appellee's Br. at 6–8. The trial court then accepted the State's explanations for both challenges, which Defendant contends was error. Therefore, we must determine whether the trial court could conclude that the State offered facially valid race-neutral reasons for the challenges.

■ First, Defendant contests the exclusion of potential juror Chandra Sherrell. The State contends that it had a race-neutral reason for challenging this potential juror in that she indicated that she would have trouble judging credibility and therefore would hold the State to a high burden of proof. *See* Appellee's Br. at 8 (citing Supp. R. at 122.) The State points to the potential juror's statements during

voir dire to the effect that she "wasn't prepared to judge anybody" and that she "couldn't possibly be sure a hundred percent that someone was guilty or not guilty." Appellee's Br. at 8 (citing Supp. R. at 110–11.) Further, the potential juror said that she would have trouble gauging credibility and that she "wouldn't feel comfortable deciding who's guilty and who's not guilty." (Supp. R. at 111–13.) Therefore, the potential juror said, the State's proof "would have to be a strong thing, without a shadow of a doubt ...." (Supp. R. at 112.)[4] It is evident from these statements that the potential juror believed that she would have difficulty judging credibility, and that she would favor Defendant to compensate for this perceived deficiency. The State therefore presented a valid race-neutral reason for removing the potential juror from the panel.

■ Second, Defendant challenges the removal of potential juror Catherine Reynolds. The State contends that it used a peremptory challenge on this potential juror because she "said that she would rather not be a juror because she had a niece who was killed by her niece's son." Appellee's Br. at 7 (citing Supp. R. at 72.) During voir dire, the State asked the potential juror for her thoughts on the jury selection process. The potential juror replied that she would rather not sit on the jury because her grandnephew had killed her niece, who was a police officer. She stated that she would have personal difficulty sitting on the panel, as she did when she had

---

3. In discussing his *Batson* claims, Defendant notes that no blacks served on his jury. Appellant's Br. at 12. However, while the State did remove two black jurors from the panel, the trial court repeatedly noted that minorities were almost completely missing from the venire. The potential jurors at issue here were two of only three blacks in the 32-person venire.

4. In argument before the trial court, the State made clear that its challenge was based on the fact that the potential juror "indicated that she could not judge, that she was not the right person to judge, that she would have to be proved beyond a shadow of [a] doubt." (Supp. R. at 122.)

served on a previous jury. While it is clear that the potential juror believed that she had a bias and should not serve on the jury, it is unclear whether this bias cut for or against the State. The trial judge acknowledged as much by noting that "we don't know whether or not she would be prejudiced against the State or the Defense...." (Supp. R. at 96.) It is conceivable that she would be biased against Defendant because a member of her family had been the victim of the crime with which Defendant was charged. However, it is equally conceivable that she would be biased against the State because another member of her family had been the accused of the crime with which Defendant was charged. The latter scenario is a valid race-neutral explanation for the peremptory challenge. *See, e.g., Willoughby,* 660 N.E.2d at 578 ("An explanation is neutral if it is 'based on something other than the race of the juror. At [the explanation stage] of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' ") (quoting *Hernandez,* 500 U.S. at 358–59, 111 S.Ct. 1859). Because the moving party bears the overall burden of proving racial discrimination, we resolve this conflict in favor of the State and conclude that the State has presented a valid race-neutral explanation for the peremptory challenge. *See Bradley v. State,* 649 N.E.2d 100, 105–06 (Ind.1995), *reh'g denied.*

## II

■ Defendant contends that his conviction must be reversed because the trial court admitted his statement to police despite what Defendant characterizes as a violation of Indiana Code § 31–32–5–1 (1998). This statute provides that rights guaranteed to a child[5] under the United States Constitution, the Indiana Constitution, or "any other law" may be waived only under a narrow set of circumstances:

(1) by counsel retained or appointed to represent the child if the child knowingly and voluntarily joins with the waiver;

(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:

(A) that person knowingly and voluntarily waives the right;

(B) that person has no interest adverse to the child;

(C) meaningful consultation has occurred between that person and the child; and

(D) the child knowingly and voluntarily joins with the waiver; or

(3) by the child, without the presence of a custodial parent, guardian, or guardian ad litem, if:

(A) the child knowingly and voluntarily consents to the waiver; and

(B) the child has been emancipated under IC 31–34–20–6 or IC 31–37–19–27, by virtue of having married, or in accordance with the laws of another state or jurisdiction.

*Id.*

The State introduced Defendant's confession based on a waiver of Defendant's Fifth Amendment right to remain silent. Defendant did not speak to an attorney prior to this waiver and he was not emancipated at the time. *See id.* § 31–32–5–1(1) and (3). Therefore, the confession is admissible only if the State shows that a parent waived Defendant's rights after providing Defendant meaningful consultation. *See id.* § 31–32–5–1(2). Defendant spoke with his father before he gave his statement to police and his father was

---

5. Defendant was seventeen at the time he gave his confession.

present during the interrogation. However, Defendant argues that this was not the "meaningful consultation" contemplated by Indiana Code § 31–32–5–1(2)(C) because his father had not been advised of Defendant's constitutional rights prior to the consultation. *See* Appellant's Br. at 10–11.

■■■■ In reviewing this claim, we note that the State bears the burden of showing that a juvenile defendant received all of the protections of Indiana Code § 31–32–5–1. *See Graham v. State,* 464 N.E.2d 1, 4 (Ind.1984), *Hickman v. State,* 654 N.E.2d 278, 281 (Ind.Ct.App.1995) ("We require strict compliance with the statute in order to protect the juvenile's rights."). However, as with any review of the admissibility of a confession, we review the evidence in the light most favorable to the trial court's decision. *See Carter v. State,* 686 N.E.2d 1254, 1258 (Ind.1997). *Cf.* Appellant's Br. at 10 ("On review, the court looks at the evidence which supports the trial court's decision.").

■■■ The meaningful consultation requirement will be met when the State demonstrates "actual consultation of a meaningful nature or . . . . the express opportunity for such consultation, which is then forsaken in the presence of the proper authority by the juvenile, so long as the juvenile knowingly and voluntarily waives his constitutional rights." *Williams v. State,* 433 N.E.2d 769, 772 (Ind.1982). *See also Patton v. State,* 588 N.E.2d 494, 496 (Ind.1992) ("The consultation requirement is designed to afford the juvenile a stabiliz-

ing and comparatively relaxed atmosphere in which to make a serious decision that could affect the rest of his life."), *reh'g denied.*

Our review of the record shows that Defendant received meaningful consultation with his father. Defendant's confession was obtained after police informed Defendant's father that Defendant was to be arrested for murder. The police gave Defendant's father fifteen to 20 minutes to consult with his son. The detective who took Defendant's statement testified that he informed Defendant that this time was set aside so that Defendant could consult with his father. The detective testified that the first thing he did after this consultation was to show Defendant and his father a written waiver of rights and he read those rights to them.[6] He asked both of them if they understood their rights and they said that they did. After explaining these rights, the detective offered Defendant's father more time to consult with his son, but Defendant's father declined. Under these facts, we hold that Defendant received a meaningful opportunity to consult with his father. *See Trowbridge v. State,* 717 N.E.2d 138, 146–51 (Ind.1999), *reh'g denied.*

■■■ As Defendant notes, we have expressly left open the question of whether a consultation with a parent is meaningful under Indiana Code § 31–32–5–1 if the parent is unaware of the child's rights prior to the consultation. *See Cherrone v. State,* 726 N.E.2d 251, 255 n. 1 (Ind.2000).[7]

---

6. The officer informed the Browns that

> You have the right to have one or both parents present. You have the right to remain silent; anything you may say can be used against you in court. You have the right to have a lawyer present now, if you do not have the money to retain a lawyer, you have the right to have one appointed for you by the court before any questions

are asked. If you decide to answer questions now without a lawyer present you still have the right to stop questioning at any time.

(R. at 314.) Both Defendant and his father signed a written waiver to this effect.

7. *But cf. Graham v. State,* 464 N.E.2d 1, 11 (Ind.1984) (DeBruler, J., dissenting) ("It is crystal clear from our statute and the cases

We reiterate that "the usual, and in our view the better, practice . . . . is to provide the consultation after advising the juvenile and his or her parents of the rights to be waived." *Id.* (citations omitted). However, the record shows that after advising Defendant's father of Defendant's rights, the detective who took Defendant's statement offered Defendant's father a second opportunity to consult with his son. Having learned of the pertinent constitutional rights, Defendant's father apparently saw no gain to be had from further consultation. Under these circumstances, the lack of an advisement of rights prior to the consultation did not affect the quality of consultation that Defendant received and therefore he is not entitled to relief.[8]

### III

 Finally, Defendant argues that the trial court committed reversible error when it refused to instruct the jury on voluntary manslaughter. Initially, we note that:

> When a defendant requests a lesser-included offense instruction, a trial court applies a three-part analysis: (1) determine whether the lesser-included offense is inherently included in the crime charged; if not, (2) determine whether the lesser-included offense is factually included in the crime charged; and, if either, (3) determine whether a serious evidentiary dispute exists whereby the jury could conclude that the lesser offense was committed but not the greater.

*Culver v. State,* 727 N.E.2d 1062, 1070 (Ind.2000) (citing *Wright v. State,* 658 N.E.2d 563, 566–67 (Ind.1995)), *reh'g denied.* As for the first two steps, we have already determined that voluntary manslaughter is a lesser included offense of murder. *See Dearman v. State,* 743 N.E.2d 757, 760–61 (Ind.2001) (noting that element of sudden heat distinguishes voluntary manslaughter from murder), *Crain v. State,* 736 N.E.2d 1223, 1237 (Ind.2000), *Wilkins v. State,* 716 N.E.2d 955, 956–57 (Ind.1999). Therefore, Defendant must demonstrate that there was a serious evidentiary dispute as to the existence of sudden heat.

 We have held that sudden heat "is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." *Dearman,* 743 N.E.2d at 760.

---

cited that the consultation of the juvenile with his parent, guardian, or counsel must come after the advisement of rights are given, . . . . so that there is assurance that the two know what is at stake in the waiver which police are attempting to get, *and* prior to the manifestation by the juvenile or his parent, guardian, or counsel to the police that a decision on the waiver question has been reached.") (emphasis in original).

8. Defendant also contends that his father was incapable of providing meaningful consultation because his father was diagnosed as paranoid schizophrenic and antisocial. Defendant does not explain how this condition would affect his father's ability to provide meaningful advice. *See* Appellant's Br. at 11. In fact, the record reflects that Defendant's father dealt with numerous offenses committed by his children and had appeared with them in juvenile court. The detective testified that the father said at the time that he understood what was occurring. These facts show that Defendant's father was not incompetent to provide meaningful consultation. *Cf. Fortson v. State,* 270 Ind. 289, 298, 385 N.E.2d 429, 436 (1979) (holding that a mother—who was an outpatient at a mental health clinic—provided meaningful consultation in part because "she did not appear ill and was in control of herself and aware of her son's rights and of her surroundings and the consequences of what was happening at the time of the waivers" and because she had provided such assistance on previous occasions.).

We find no such evidence in the present record. To establish sudden heat, Defendant relies on the fact that he had returned to the house to find his friend Caruthers, who had been in an argument earlier in the day. He also cites the fact that both Moore and the occupants of the car were rude to him. None of this evidence paints a scenario where sudden circumstances caused Defendant to loose control of his rational senses. First, while Defendant might have been afraid for his friend Caruthers as a result of the argument Caruthers had with Moore's associates, this fact alone does not suggest that Defendant was acting under *sudden* heat when he returned to the house several hours later. *Cf. Isom v. State*, 501 N.E.2d 1074, 1075 (Ind.1986) ("Forty minutes after the initial confrontation, Appellant found Payton, threatened him, and shot him numerous times, knowing him to be unarmed. This evidence is sufficient to support the inference that an adequate 'cooling off period' had elapsed, and that therefore, the shooting was not done in a 'sudden heat.' "). Second, while Defendant might have been insulted by the conduct of Moore and his friends, these personal slights were not the type of provocation that the law recognizes as sufficient to cause one to abandon all reason under sudden *heat*. *Cf. White v. State*, 699 N.E.2d 630, 635 (Ind.1998) ("In the present case, defendant can only point to the exchange of words and insults as evidence of provocation. This was an ordinary argument gone bad. There is no evidence to support an attempted voluntary manslaughter instruction."). Having reviewed the record, we find that there is no "appreciable evidence of sudden heat" that would justify an instruction on voluntary manslaughter under *Wright*. *Dearman*, 743 N.E.2d at 760.

*Conclusion*

We affirm the judgment of the trial court.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.