## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 15 2018, 9:09 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael C. Borschel
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Landon Tompkins,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 15, 2018<br><br>Court of Appeals Case No.<br>49A05-1706-CR-1418<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marc T. Rothenberg, Judge<br><br>Trial Court Cause No.<br>49G02-1401-FA-2295 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Landon Tompkins was convicted of attempted murder, a Class A felony, and the trial court sentenced him to forty-eight years in the Indiana Department of Correction. Tompkins now appeals his conviction and sentence, raising four issues for our review which we restate as: (1) whether the trial court committed fundamental error regarding the State's use of two peremptory strikes; (2) whether the State presented sufficient evidence to support his conviction for attempted murder; (3) whether the trial court abused its sentencing discretion; and (4) whether Tompkins' sentence is inappropriate. Concluding the trial court did not commit fundamental error, the State presented sufficient evidence, the trial court did not abuse its discretion, and Tompkins' sentence is not inappropriate, we affirm.

# Facts and Procedural History

[2] On January 13, 2014, Tompkins, Deandre Franklin, and Joshua Henderson decided to rob a taxi driver. Tompkins, then eighteen, drove the others to Abney Lake Apartments in Indianapolis and called Yellow Cab. Taxi driver Ricardo White was dispatched to the apartments and when he arrived, Franklin and Tompkins entered his car, leaving Henderson behind. As evidenced by a video recording later admitted into evidence, Franklin entered through the rear passenger door and slid across to the rear driver side, followed by Tompkins who remained on the passenger side. The two told White to drive to "Uh, 38th and Martin Luther King," before almost immediately instructing White to stop

the car. State's Exhibit 7. Tompkins opened the rear passenger door and put his handgun to White's head; upon noticing the handgun, White said "Oh, sh*t," put his arm up, and flinched. *Id.* Tompkins shot White through his jaw and into his neck before immediately fleeing the scene. Franklin then reached around with a handgun and shot White in his shoulder before following Tompkins from the scene. No demand for money was ever made.

[3]     Bleeding profusely, White drove to the entrance of the apartment complex and fell out of his car to the concrete below. White was eventually discovered on the ground and rushed to the hospital where his heart stopped twice. The bullet fired by Tompkins hit White's external carotid artery and is still lodged in his neck. White also had to have his jaw replaced.

[4]     The day after the shooting the police released still photographs of Tompkins and Franklin taken from the recording. That same day, Tompkins Googled "cab shooting" on his phone, clicked on local news stories about the shooting, and deactivated his Facebook account before continuing the search the next day. Transcript, Volume III at 2. Tompkins also Googled "how to check to see if you have a warrant" and "how many years do you get for attempted murder." *Id.* at 3-4.

[5]     On January 23, 2014, Tompkins was charged with attempted murder and attempted robbery, both Class A felonies, and aggravated battery, a Class B felony. The State subsequently dismissed the charge of aggravated battery and a jury trial was conducted over a period of two days. During voir dire,

Tompkins objected to the State's use of peremptory strikes on two prospective jurors who were African American but the trial court permitted the strikes over Tompkins' objection.

[6] The jury eventually found Tompkins guilty of attempted murder but not guilty of the charge of attempted robbery. At his sentencing hearing, the court found Tompkins' lengthy criminal history and the nature and circumstances of his crime to be aggravators and found no mitigators before sentencing Tompkins to forty-eight years. Tompkins now appeals.

# Discussion and Decision

## I. *Batson* Challenges

[7] Tompkins alleges that the trial court committed clear error in overruling his "two timely *Batson* challenges on the record to the State's peremptory strikes of two African-American veniremen." Brief for Appellant at 22.

[8] In *Batson v. Kentucky,* the United States Supreme Court held that a prosecutor's use of peremptory challenges in a criminal case—the dismissal of jurors without cause—may not be used to exclude jurors based solely on their race. 476 U.S. 79, 100 (1986). "Purposeful racial discrimination in selection of the venire violates the defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id.* at 86. The Court therefore outlined a three-step process to be employed where a party raises a *Batson* challenge. "Upon appellate review, a trial court's decision concerning

whether a peremptory challenge is discriminatory is given great deference, and will be set aside only if found to be clearly erroneous." *Forrest v. State*, 757 N.E.2d 1003, 1004 (Ind. 2008).

[9]     The first step involves a defendant showing "circumstances raising an inference that discrimination occurred." *Addison v. State*, 962 N.E.2d 1202, 1208 (Ind. 2012). This is a low burden and commonly referred to as a "prima facie" showing. *Id.* Here, the State exercised peremptory challenges on the only two African American men—Juror No. 1 and Juror No. 18. In *Addison*, our supreme court explained:

> Although the removal of some African American jurors by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination, the removal of the only . . . African American juror that could have served on the petit jury does raise an inference that the juror was excluded on the basis of race.

*Id*. (citation and quotations omitted). We need not decide whether Tompkins established a prima facie case because, "where, as here, a prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing of purposeful discrimination becomes moot." *Cartwright v. State*, 962 N.E.2d 1217, 1222 (Ind. 2012).

[10]    Having satisfied the first step, the second step involves shifting the burden to the prosecution to "offer a race-neutral basis for striking the juror in question."

*Addison*, 962 N.E.2d at 1209. Although this race-neutral reason need not be particularly "persuasive, or even plausible," it must be more than a mere denial of improper motive and lack inherent discriminatory intent. *Id.*

[11]     Tompkins appears to allege that the State's race-neutral reason for striking Juror No. 1 was his "Muslim background." Br. for Appellant at 25. However, our review of the record reveals something different. During voir dire, the State engaged in the following exchange:

> [State]:     Okay. And I would – there are times that somebody does take to a plan to a crime and – but sometimes it's just a spur of the moment thing. [Juror No. 1], what do you think about that?
>
> [Juror No. 1]: Well you know it's the I guess by me being – I got family that always was into something you know the crime stuff like that so. You least don't take – watching them you least don't take it. Sometimes they don't be thinking you know what they be doing.
>
> [State]:     Okay. Do– are you – are you kind of saying that sometimes maybe people are just to [sic] rash?
>
> [Juror No. 1]: Yeah. You know sometimes you got – you know they're not thinking. You know rationally. You know sometimes you know – sometimes I found out with my background – but sometimes people like they fighting within themselves. You know -- so.

Supplemental Transcript, Volume II at 34-35. The State later exercised a

peremptory strike on Juror No. 1, explaining:

[State]:    . . . He indicated that he had a lot of –
(indiscernible) in the system and he indicated that
he thinks that we had to (indiscernible).

[The Court]: All right. For the purposes of - -

[Defense]:    - - (Indiscernible).

[State]:    Okay. And I - - first of all I would disagree that
we've got there because I don't believe there's been
a pattern shown.

[The Court]: Once [sic] person can be a pattern. Then -- then the
law makes Batson makes it very - - hold on.

[Defense]:    I don't understand how are saying going to the
Islamic people –

[State]:    Shhh.

[Defense]:    -- background in arguing the system is only - -
already –

[State]:    I'm talking about what he said when I
(indiscernible)

[The Court]: Okay. All right. You've shown that there is -- that
someone was struck who's a minority. Which is
prima facia case for the purposes of it. I have a [sic]

it butted with a racially neutral reason for the
dismissal.  Note -- noted for the record.  All right.
Your motion for (indiscernible) is denied.  All right.
Thank you.

*Id.* at 62-63.

[12]   "A neutral explanation means an explanation based on something other than
the race of the juror."  *Blackmon v. State*, 47 N.E.3d 1225, 1232 (Ind. Ct. App.
2015) (citation and quotation omitted).  The State's proffered reasons for
striking Juror No. 1 were the facts that he had family experience with the
criminal justice system and that he would have held the State to a higher
burden of proof.  As such, the State presented valid race-neutral reasons for
striking Juror No. 1 from the panel.  *See, e.g., Brown v. State,* 751 N.E.2d 664,
668 (Ind. 2001) (holding that the State presented a valid race-neutral reason for
removing a potential juror who said she would have trouble judging credibility
and would therefore hold the State to a higher burden of proof).

[13]   Similarly, Tompkins alleges that the State's use of a peremptory strike on Juror
No. 18 was "pretextual and not race-neutral[.]"  Br. for Appellant at 28.
During voir dire, the State presented Juror No. 18 with the following
hypothetical:

[State]:     [Defense counsel] gave you the hypothetical of a
shoplifting case.  Someone walked out -- from the
store with merchandise, makes no effort to pay, gets
out to their car.  I think we can all agree we've
satisfied all the elements.  This person wanted to
take this property.  They intended to take the

property out of the store. Did not intend to pay for it. We all agree?

[Jurors]:      No audible response.

[State]:      Okay. So we all agree that the proper verdict for theft would be guilty. Is that right?

[Jurors]:      No audible response.

[State]:      All right. Now what if we had two witnesses, they are both in agreement that this guy walked out of the store (indiscernible). One witness says he got into a black car and the other witness says he got into a blue car. [Juror No. 18], what's your verdict there? They're both -- they're both sure it was this guy that walked out of the store with the merchandise and I'm gonna make this a very obvious hypothetical, there was a video of this man walking out of the store with the merchandise in his hand. However, unclear about which car he got into at that point. What's your verdict?

[Juror No. 18]: (Unintelligible).

[State]:      Okay. I -- I changed up the hypothetical sir. I do have a camera now. The camera shows the guy.

[Juror No. 18]: Yeah.

[State]:      Okay. . . .

Supp. Tr., Vol II at 67-68.  After the State used a peremptory strike on Juror

No. 18, Tompkins objected:

> [State]: I want the state to have to prove there's a racially unbiased reason for striking [Juror No. 18].
>
> [The Court]: Okay. All right. I note then it was -- to go through thing.  I note that there was a minority member who was here that was stricken.  State?
>
> [State]: Thank you Judge.  Judge from his answers I spent probably about four or five minutes on the hypothetical that I intended to make increasingly, and increasingly obvious, and he would not give me an answer.  Would not give me a straight answer about whether that's [sic] be enough. Basically said, if we satisfied all the elements of the crime, we had this unrelated issue would that be enough for you and he said —— he would not give an answer.  He said it wasn't enough and then would not give an answer.  I think he's gonna have an incredibly high burden of prove [sic].  It sounds like he would get caught up on unrelated issues quite frankly.  I'm not entirely sure he understood the hypothetical cause I think it was very obvious –
>
> [The Court]: Okay.
>
> [State]: —— to the jurors.
>
> [The Court]: All right.
>
> [State]: And so I've got issues number one that I -- I think he's [sic] burden of proof would be unrealistically

high because based on his reactions to the hypothetical. Reason number two would be if those —— if that didn't reflect it, it's an unreasonably high burden of proof, then he just didn't understand it and I mean jurors were laughing ——

[The Court]: Okay.

[State]: -- because it's obvious.

[The Court]: All right. I believe the state has satisfied its burden.

[State]: I would also point out that it's same ——

[Defense]: Judge, just for the record (indiscernible). (Indiscernible) struck the only two black man [sic] that were in the jury pool.

[The Court]: Yep, and they've given me -- and you can make your record but they have given me ——

[State]: —— shh. Judge, we have (indiscernible).

[The Court]: —— I'm getting there. They've given me a natural reasoning.

[Defense]: And I just want that part to be part of the record.

[The Court]: Okay, but I'm gonna also point out for the record that they in fact there are —— whether men or females, also there are minorities on this jury panel.

[State]:  And specifically to, I've got African American
females –

[The Court]: Okay.

[State]:  (Indiscernible).

[The Court]: So, I'm stating that you're —— you're [sic] request
for the motion for (indiscernible) any way, shape, or
form, but the fact is that I think the state has
without a doubt provided me with necessary
rebuttal aspects to your challenge.

[State]:  And I would also, just for the record, that's the
exact same reason that we struck [Juror No. 1]
because was also unrealistic and ——

[The Court]: That's fine. Well that was even earlier.

[The State]:  I just wanted to make that –

[The Court]: That was fine. All right.

*Id.* at 82-84.

[14]  As with Juror No. 1, the State presented a valid race-neutral reason for striking

Juror No. 18.  The State explained that because of Juror No. 18's reaction to

the hypothetical, the State feared he would require too high a burden of proof

and become distracted by unrelated issues.  "Unless a discriminatory intent is

inherent in the prosecutor's explanation, the reason offered will be deemed race

neutral." *Addison*, 962 N.E.2d at 1209.

[15]     The third step of the *Batson* inquiry requires the trial court to determine "whether the defendant has shown purposeful discrimination." *Id*. As we have previously explained:

> It is then that implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. The third step requires the trial court to assess the credibility of the State's race-neutral explanation in light of all evidence with a bearing on it. At this stage, the defendant may offer additional evidence to demonstrate that the prosecutor's explanation was pretextual. Although this third step involves evaluating the persuasiveness of the justification proffered by the prosecutor, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. In considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted.

*Blackmon,* 47 N.E.3d at 1232-33 (citation and quotations omitted).

[16]     Regarding this third step, Tompkins alleges that the trial court "clearly erred by failing to make specific findings as to the State's offered race-neutral explanations." Br. for Appellant at 30. Although this court has stated that "a trial court is not required to make explicit fact-findings following a *Batson* challenge[,]" *Blackmon*, 47 N.E.3d at 1233, our supreme court has warned against the dangers of combining the second and third steps of the *Batson* inquiry because the "analytical structure established by *Batson* cannot operate properly if the second and third steps are conflated." *Addison,* 962 N.E.2d at 1210. Like the trial court's failure in *Addison* to indicate "whether or why it

found the State's proffered explanation credible," *id.*, here, the trial court also failed to make findings—simply stating that the "state has satisfied its burden," Supp. Tr., Vol. II at 83, and that there was a "racially neutral reason for the dismissal," *id.* at 62.

[17] With that said, other than expressing that he did not "understand" the State's rationale for striking Juror No. 1, Tompkins never objected to the State's proffered race-neutral reasons nor rebutted them with arguments that they were pretextual. Supp. Tr., Vol. II at 62. Rather, Tompkins advances this argument for the first time on appeal and, in such cases, we apply the fundamental error doctrine. *Addison*, 962 N.E.2d at 1213 (applying the fundamental error doctrine where a defendant failed to object to the State's proffered race-neutral explanation). Our supreme court explained the fundamental error doctrine as:

> extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. Further, fundamental error applies only when the actual or potential harm cannot be denied.

*Id.* (citations and quotations omitted).

[18] On appeal, Tompkins has still failed to advance a coherent argument regarding why the State's proffered reasons were pretextual—merely positing that they were "implausible." Br. for Appellant at 30. Therefore, in light of this rigorous

standard of review and having concluded that the State's proffered race-neutral reasons are supported by the record, we conclude the trial court's denial of Tompkins' *Batson* challenges was not fundamental error.

# II. Sufficiency of the Evidence

## A. Standard of Review

[19] When reviewing a challenge to the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind. 2003). A reviewing court looks only to the probative evidence supporting the judgment and the reasonable inferences from that evidence to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.* We will uphold the conviction if there is substantial evidence of probative value to support it. *Id.*

## B. Attempted Murder

[20] To sustain a conviction for attempted murder, the State must prove two elements beyond a reasonable doubt:

> First, the defendant must have been acting with a *specific intent* to commit the crime, and second, he must have engaged in an overt act which constitutes a substantial step toward the commission of the crime.

*Spradlin v. State*, 569 N.E.2d 948, 949 (Ind. 1991). On appeal, Tompkins claims that "the State failed to show beyond a reasonable doubt that Mr. Tompkins

intended to kill, rather than merely harm, Mr. White." Br. for Appellant at 11. We disagree.

[21] In *Henley v. State,* our supreme court explained:

> A conviction for attempted murder requires proof of a specific intent to kill. Because intent is a mental state, we have noted that intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury. And firing a gun in the direction of an individual is substantial evidence from which a jury may infer intent to kill.

881 N.E.2d 639, 652 (Ind. 2008) (citations omitted).

[22] Here, the State presented video footage from the taxi's interior camera. The video shows Tompkins hold a handgun to White's head, adjust his aim as White's head moved, and then shoot White in the jaw from point-blank range. This evidence alone is sufficient for the jury to infer Tompkins' intent. *See Booker v. State,* 741 N.E.2d 748, 756 (Ind. Ct. App. 2000) (holding that direct evidence of defendant shooting victim in the neck from point-blank range was sufficient for jury to infer that defendant acted with the intent to kill).

## III. Tompkins' Sentence

[23] Next, Tompkins alleges that the trial court abused its discretion in sentencing him and that his forty-eight year sentence is inappropriate.

# A. Abuse of Discretion

[24] Tompkins alleges that the trial court abused its discretion in sentencing him. The sentencing range for a Class A felony is twenty to fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4 (2013). Tompkins received a sentence of forty-eight years.

[25] Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). Therefore, if a sentence is within the statutory range, as here, we review the sentence only for abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* We have explained that a trial court may abuse its discretion in sentencing in the following ways:

> (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law.

*Williams v. State,* 997 N.E.2d 1154, 1164 (Ind. Ct. App. 2013).

[26] Here, the trial court found a number of aggravators supporting Tompkins' near-maximum sentence. The trial court explained:

All right. Mr. Tompkins, I don't know – two things. Two things. The State said something and the Defense said something. I take issue with both of them actually. I think the State said something to the effect of, We all understood what happened. And my answer is no. I still don't understand what happened. I sat here and I watched a crime. Your attorney – yeah. We don't know what was going on in your head. And I don't. And I probably never will because what I saw was – it wasn't a robbery. It wasn't anything other than a man trying to kill another man. And not out of anger. Not out of hate. Not out of reason. Just simply for the hell of it. And I've seen a lot of things in this court. I've seen a lot of horrible, horrible, horrible things. I've seen – I've seen people mutilated with knives to the point where you can't recognize them. I've seen bodies killed, tied and burnt to a crisp where you can't recognize them. I've seen some of the most horrific things in my life sitting here in this chair, but I don't think I've ever seen anything as horrific as what I saw in that video which was someone putting a gun to another man's head for no reason whatsoever and pulling the trigger. It was something out of – it was something akin to a Vietnam photo out of Life Magazine. It was something that will never escape my mind. And that person was you.

Tr., Vol. III at 54-55.

[27] Tompkins alleges that the foregoing explanation is evidence that the trial court's "emotional reaction, rather than Mr. Tompkins' actions in and of themselves, was the basis for enhancing Mr. Tompkins's sentence beyond the advisory 30-year sentence . . . ," and that "the trial court wrongly used an essential element of the crime, viz. intent, to enhance Mr. Tompkins' sentence (48 years) to nearly the statutory maximum (50 years), where the record does not support the enhancement, as described by the sentencing court." Br. for Appellant at 14-16.

On review, we view the trial court's statements simply as a consideration of the nature and circumstances of Tompkins' crime—a valid aggravator. *Anglemyer*, 868 N.E.2d at 492.

[28] Finally, Tompkins argues that the trial court abused its discretion by failing to relate Tompkins' criminal history to the instant offense. The weight of a defendant's criminal history is measured "by the number of prior convictions and their gravity, by their proximity to or distance from the present offense, and by any similarity or dissimilarity to the present offense that might reflect on a defendant's culpability." *Duncan v. State*, 857 N.E.2d 955, 959 (Ind. 2006).

[29] Here, although the trial court did not expressly relate Tompkins' criminal history to the instant offense, the trial court did observe Tompkins' "lengthy juvenile history" and noted that "[i]t's not as if there was a large gap between his criminal [sic] and adult crimes." Tr., Vol. III at 57. Additionally, Tompkins' crimes are similar to the instant offense and include adjudications for battery resulting in bodily injury, resisting law enforcement, burglary, auto theft, and battery against a police officer. We therefore conclude the trial court did not abuse its discretion in identifying Tompkins' juvenile criminal history as an aggravating factor.

## B. Inappropriate Sentence

[30] We may review and revise criminal sentences pursuant to the authority derived from Article 7, Section 6 of the Indiana Constitution. Indiana Appellate Rule 7(B) empowers us to revise a sentence "if, after due consideration of the trial

court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this court that his or her sentence is inappropriate, *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006), and we may look to any factors appearing in the record in making such a determination, *Stokes v. State*, 947 N.E.2d 1033, 1038 (Ind. Ct. App. 2011), *trans. denied*.

### 1. Nature of Tompkins' Offense

[31] The sentencing range for a Class A felony is twenty to fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4 (2013). Tompkins received a sentence of forty-eight years.

[32] Tompkins alleges that the nature of his offense renders his sentence inappropriate because, although Tompkins "vaguely intended to rob a cab driver . . . no demand regarding robbery was ever made . . . ." Brief for Appellant at 19. We fail to understand how this fact renders Tompkins' sentence inappropriate for attempted murder and we instead observe that it renders his crime even more senseless. Regardless, the evidence established that the crime was premeditated. Tompkins lured White to the scene of the crime and Tompkins shot White from point-blank range before fleeing the scene. We find nothing about the nature of Tompkins crime to render his sentence inappropriate.

### 2. Tompkins' Character

[33] We have previously explained:

> The "character of the offender" portion of the standard refers to the general sentencing considerations and the relevant aggravating and mitigating circumstances. We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate.

*Reis v. State*, 88 N.E.2d 1099, 1105 (Ind. Ct. App. 2017) (citations omitted).

[34] Tompkins also alleges that his sentence is inappropriate in light of his character. In so doing, Tompkins points to several factors he argues are favorable to his character including the fact that he was "barely" eighteen at the time of the crime; that although he contested his intent to kill, he accepted responsibility for shooting White; and that his juvenile criminal history is unrelated to the instant offense. Br. for Appellant at 19. We find Tompkins' arguments unconvincing.

[35] First, Tompkins' lengthy juvenile criminal record includes adjudications for battery resulting in bodily injury, three instances of resisting law enforcement, three instances of burglary, auto theft, and battery against a police officer. Even a minor criminal record reflects poorly on a defendant's character, *Rutherford v. State*, 886, N.E.2d 867, 874 (Ind. Ct. App. 2007), and we cannot say an eighteen-year-old with that many adjudications has only a "minor criminal record." Second, Tompkins has several adjudications for violent offenses which is contrary to his assertion that his criminal history is unrelated to the instant offense. And third, the fact that Tompkins "only" contested his intent at trial is entitled to little value because the shooting was captured on video, leaving little room for Tompkins' denial.

[36] Additionally, Tompkins argues that his sentence is inappropriate because his "near-maximum sentence is materially disproportionate to that received by his equally culpable and only slightly younger co-defendant, Deandre Franklin." Br. for Appellant at 20. Again, we disagree. Franklin was a minor at the time of the crime and, as reflected by the very nature of our juvenile criminal justice system, he is not equally culpable. Franklin also cooperated with the investigation and accepted responsibility for his actions by way of a guilty plea. Most importantly, however, Tompkins' crime was different than Franklin's. The record reflects that Tompkins took the lead and lured White to the apartment complex before instructing him where to go and when to stop. Only after Tompkins shot White in the head did Franklin follow suit and shoot White in the shoulder.

[37] In sum, we find nothing about the nature of Tompkins' offense or his character to render his sentence inappropriate. We therefore decline Tompkins' invitation to revise his sentence.

## Conclusion

[38] For the reasons explained above, we affirm Tompkins' conviction and sentence.

[39] Affirmed.

Crone, J., and Bradford, J., concur.